## WILLIAM HURD *vs.* ALLEN C. CURTIS & another.

A. conveyed to B., by deed of release, a parcel of land, " with a paper mill privilege on the premises, and flooms, watercourses, dams, right of way and passage, with the right of water for one paper mill with two engines, being one of the six paper mill rights and privileges established and agreed upon by certain articles of agreement," referred to; said conveyed paper mill privilege " to be entitled to all the rights, and none other, and subject to all the restrictions, terms and conditions " in said articles of agreement contained : A. also, in the same deed, granted, assigned and conveyed to B. " all the rights. privileges, benefits and interest, in and to the exceptions and reservations which said A. excepted and reserved by his deed to C." of a prior date : By said prior deed of A. to C., A. conveyed to C. a parcel of land, " together with a paper mill privilege, with the flooms, watercourses and dam, to the same belonging, with the right of water for one paper mill with two engines, being one of the six paper mill rights and privileges established and agreed upon by certain articles of agreement," [the same which were referred to in A.'s deed to B..] " *except* the reserve of the right and privilege of conveying water through the premises hereby granted and conveyed, in the channel now open, in which water used to run to a saw mill; for the purpose of carrying such water works as he (A ) may wish to erect on his premises adjoining the premises hereby conveyed, with the right of widening said channel, not exceeding sixteen feet, and of deepening the same," &c. *Held*, that A.'s grant to B. of the rights, privileges, benefits and interest in and to the exceptions and reservations which A. excepted and reserved in and by his deed to C., did not enlarge the water power and privilege released to B. in the former part of A.'s deed to him.

Where the several owners of mills and mill privileges on the same waterfall apportioned the water among themselves, and a certain part thereof was assigned to W., the owner of a fulling mill, for the use of that mill, " or for other machinery requiring equal power," it was *held*, that the right was not inseparably annexed to the building or site at which the water was then used; but that it might be used and enjoyed at any convenient site, at which a mill could be so placed as to take an equal quantity of water, without any greater injury to the other mill owners ; and therefore, that the sale by W. to A., another mill owner, of the land across which the water used to run to the fulling mill, in an artificial channel. did not extinguish the fulling mill right ; but that the subsequent conveyance of that right by W to B.,

Hurd *v.* Curtis & another.

another mill owner, entitled B. to use that right, as against A., for a fulling mill, or for any other machinery.

A mill privilege cannot be considered as extinguished or abandoned by disuse, until such disuse, entire and complete, has continued twenty years.

TRESPASS upon the case, for diverting water from the plaintiff's mills. The declaration contained three counts. In the first, the plaintiff set forth that he was the owner of a paper mill, with the apparatus and privileges, in Needham, on the Lower Falls, so called, of Charles River, and that he had a right to the use and enjoyment of the water, in sufficient quantities, at all times and seasons, to drive his paper mill, with two engines and a glazing machine, and the apparatus connected with them; and he alleged that the defendants, on the 1st of January 1836, and on divers other days and times, to the date of his writ, (which was January 17th 1842,) by means of large sluice-ways, flooms and gates, and by the erection and use of large mills, and driving large quantities of machinery, had unlawfully diverted the water from his said paper mill. The second count set forth a like injury to the plaintiff's saw mill privilege in Needham. The third count described the plaintiff's injury in more general terms.

At the trial before *Hubbard*, J., it appeared that Charles River was the dividing line between the towns of Needham and Newton, and that the plaintiff owned a paper mill on the Needham side of the river, and claimed a saw mill privilege on the Newton side; and that the defendants owned paper mills on the Newton side. The defendants insisted, that by grant and long user, they had a right to use all the water which they had used for their mills, and that the plaintiff, by the deeds under which he held his mill privilege, and by usage, was restricted to the use of a quantity of water less than that which he had used for six years last past, and longer; and that he was further so restricted by an agreement *in pais*, made and executed between him and the defendants and others, whereby the water was actually divided among the parties to said agreement. The defendants also denied that the plaintiff had any such saw mill right as he had set forth in his second count.

The plaintiff, to maintain the issue on his part, read the following deed, dated April 20th 1824, from Allen C. Curtis and William Curtis, (the defendants,) and John Nichols and Rufus Ellis, to John Dodd: " We have remised, released, and forever quitclaimed, and do, for ourselves and our heirs, by these presents *remise, release, and forever quitclaim* unto said Dodd, his heirs and assigns, a certain piece of land situated in Needham, in the county of Norfolk, containing an acre and a half, more or less, lying at the upper dam on Charles River, at the Lower Falls, so called, and bounded as follows, to wit: Beginning at a stake and stones by the Sherburne road, standing on the westerly side thereof, opposite the southwesterly corner of land of Enoch Fiske ; thence running westerly, by an elm tree, to a buttonwood tree, to land of Amos Lyon ; thence in a southwesterly direction to an elm tree standing near the margin of Charles River ; thence in the same direction to said river ; and bounded northerly and northwesterly by land of Amos Lyon, westerly partly by said river and partly by Benjamin Slack ; southerly by land of said Slack, and southeasterly and easterly by said Sherburne road ; together with a paper mill privilege on the premises, with the flooms, watercourses, dam, rights of way and passage, with the right of water for one paper mill with two engines, being one of the six paper mill rights and privileges established and agreed upon by certain articles of agreement, of four parts, made and executed between Simon Eliot and Solomon Curtis of the first part, Moses Grant of the second part, William Hurd and Charles Bemis of the third part, and John Ware of the fourth part, dated the 26th day of July 1816, one part of which is recorded in the registry of deeds for the county of Middlesex, book 220, page 149. The said paper mill privilege, hereby conveyed to said Dodd, to be entitled to all the rights, and none other, and subject to all the restrictions, terms, conditions and agreements, both as to the erection and support of dams and flooms, construction of wheels, and use of water, in every respect and particular whatsoever, as named in the aforesaid articles of agreement. And the said Allen C. Curtis, William Curtis, John Nichols

and Rufus Ellis, do hereby *grant, assign, and convey* to the said Dodd, his heirs and assigns, all the rights, privileges, benefits and interest, in and to the exceptions and reservations which the said Allen C. Curtis, William Curtis and John Nichols, with one George Hooker, excepted and reserved to themselves and their heirs, in and by their deed to Amos Lyon, bearing date the 11th of April 1822, and recorded in the registry of deeds for the county of Norfolk, book 64, page 180 ; which exceptions and reservations are in the words following, to wit : ' *The right and privilege of conveying water through the premises hereby (by said deed to said Lyon) granted and conveyed to said Lyon in the channel now open, in which water used to run to a saw mill, for the purpose of carrying such water works as they may wish to erect on their premises adjoining the premises hereby conveyed, with the right of widening said channel not exceeding sixteen feet, and of deepening the same as much as they may find it necessary ; and of erecting and keeping a dam, or dams, across said channel, with gates to let in or exclude the water, at such place or places as they may choose, with the right and privilege of entering upon and using the premises thereby conveyed to said Lyon, for the purpose of making such alterations, improvements and repairs, in and upon said channel, and the dams, gates and coverings, as they may erect in, upon and across the same.*' "

The plaintiff claimed title to the premises described in the foregoing deed, and gave in evidence the mesne conveyances through which his title thereto came to him.   He also read a warranty deed from Allen C. Curtis, William Curtis, (the defendants,) John Nichols and George Hooker, to Amos Lyon, dated April 11th 1822, which thus described the land thereby conveyed :

" A certain piece of land situated in Needham, in the county of Norfolk, containing by estimation an acre and a half, be the same more or less, lying on Charles River, at the upper dam, at the Lower Falls, so called, and bounded as follows, to wit : Beginning at the northeast corner, by the bridge over Charles River, and running southwesterly and southerly on said river to an elm tree standing near the water on the east side of Peter

Lyon's mill pond, and bounded northerly and westerly on said river and mill pond; from said elm tree running easterly to a buttonwood tree standing near the bend in the channel through which water was formerly conveyed to a saw mill; thence easterly to an elm tree near the county road; thence in same direction in a straight line to said road; thence northerly on said road to the place of beginning; together with a paper mill privilege at the said upper dam, with the flooms, water-courses, and dam to the same belonging, with the exception and reservation hereinafter named; with the right of water for one paper mill with two engines, being one of the six paper mill rights and privileges established and agreed upon by certain articles of agreement of four parts, made and executed by and between Simon Eliot and Solomon Curtis of the first part, Moses Grant of the second part, William Hurd and Charles Bemis of the third part, and John Ware of the fourth part, dated the 26th day of July 1816, one part of which is recorded in the registry of deeds for the county of Middlesex, book 220, page 149. The said paper mill privilege, hereby conveyed to the said Lyon, to be entitled to all the rights, and none other, and subject to all the restrictions, conditions and agreements, both as to the erection and support of dams and flooms, construction of wheels, and use of water, in every respect and particular whatever, as named in the aforesaid articles of agreement. And the said Allen Crocker Curtis, William Curtis, John Nichols and George Hooker, except the reserve to themselves, their heirs and assigns, *the right and privilege of conveying water through,*" &c., [as above set forth at large in italics, in the deed to John Dodd.]

The plaintiff then put in the agreement of July 26th 1816, which is referred to in the two deeds aforesaid, and is copied in the margin.*

---

\* This indenture, of four parts, made this twenty sixth day of July in the year of our Lord one thousand eight hundred and sixteen, between Simon Eliot Esquire, and Solomon Curtis gentleman, both of Newton, in the county of Middlesex and Commonwealth of Massachusetts, on the *first* part; Moses Grant, of Boston, in the county of Suffolk, merchant, on the *second* part; Wil-

Hurd *v.* Curtis & another.

It appeared that there were four paper mills, one fulling mill and one saw mill, on the Newton side, and two paper mills and

---

liam Hurd, paper maker, and Charles Bemis, paper maker, both of said Newton, on the *third* part; and John Ware, of said Newton, gentleman, on the *fourth* part, *Witnesseth ;*

That the said parties are severally interested in the mills and mill privileges at the upper dam, at what is called Newton Lower Falls, on Charles River; the mills and mill privileges on said dam, on each side of the river, consisting of two paper mill rights or privileges, and one saw mill on the Needham side, and of four paper mills, one fulling mill and one saw mill on the Newton side. Said mills and mill privileges are owned as follows, to wit : The said Eliot and Curtis own two thirds of the paper mill privileges and of the saw mill on the Needham, or south side of the river, and the two southern paper mills and paper mill privileges on the Newton or northern side of the river : The said Hurd and Bemis own one third of the paper mill privileges and of the saw mill on the Needham side, a paper mill and paper mill privilege, and the saw mill on the Newton side : The said Grant owns a paper mill and paper mill privilege on the Newton side ; and the said Ware owns the fulling mill, with the privilege of water to work a fulling and wool carding machine on the Newton side. And for the purpose of fixing as near as possible the quantity of water which each of the aforesaid parties shall have a right to draw and use at their respective mills and mill privileges, and to regulate the use of the same, especially when the water is so low that all said mills cannot be in use at the same time, and to prevent all disputes and litigation concerning their respective rights and privileges aforesaid ; they, the said Eliot and Curtis on the *first* part, the said Grant on the *second* part, the said Hurd and Bemis on the *third* part, and the said Ware on the *fourth* part, for themselves, their heirs, administrators and assigns, respectively, do hereby covenant and agree to and with each other, and their respective heirs, administrators and assigns:

That the said six paper mill rights and privileges, to wit, the two on the Needham side, owned two thirds by said Eliot and Curtis, and one third by said Hurd and Bemis, the two owned by said Eliot and Curtis on the Newton side, the one owned by said Hurd and Bemis, the one owned by said Grant, and the fulling mill owned by the said Ware, on the same side, shall have the first and exclusive right to the use of the water at said dam, when no more runs to the paper mills and fulling mill now erected and used, or that may be erected and used, on said six paper mill privileges and fulling mill privilege, than shall be necessary to work them to advantage : That the saw mill owned by the said Hurd and Bemis, on the Newton side, shall have the second right of water, or the first right to the overplus water : That the glazing machines now belonging, or that may be attached to all said six paper mills and paper mill privileges, shall have the third right of water, or the second right to overplus water ; and that the saw mill owned by said Eliot and Curtis, and Hurd and Bemis, on the Needham side, shall have the fourth right of water, or the third right to overplus water; and that neither of said saw mills, or glazing machines, or any other works that may be erected and used on said dam, shall have any right to use the water when there shall be no more than sufficient at said dam to work to advantage all

one saw mill on the Needham side, which were embraced in
the agreement of July 26th 1816, and that they were owned,

the mills now erected and used, or that may be erected and used on said six
paper mill and fulling mill privileges.

And the parties do hereby further covenant and agree to and with each other,
as aforesaid, that all the said paper mills and fulling mill now erected and
used, *as soon as may be,* and all mills that may be erected and used on any of
said six paper mill and fulling mill privileges, before they are put into operation
and use, shall be altered and built with breast wheels of a good and approved
construction, each for a power equal to carrying two paper engines in the paper
mills, and in the fulling mill for a power equal to carrying a fulling and wool
carding machine; that all the flooms or sluice-ways, as soon as may be, shall be
altered and built in a good and approved manner, suitable for breast wheels;
and that all the gates of all the mills, or breast wheels, on the said six paper mill
and fulling mill privileges, shall be drawn from the same level, as well those on
the Newton as those on the Needham side, and to be on a level with some firm
and permanent mark, to be put down or made by consent of the parties.

And the parties do hereby further covenant and agree to and with each other,
as aforesaid, that whenever the water in said Charles River shall be so low that
all the mills now erected and used, or that may be erected and used on said
six paper mill privileges, and on said fulling mill privilege, cannot be used at the
same time, the fulling mill of the said Ware shall go and be used six hours
every day, and no more, so long as a deficiency of water shall continue; and the
four paper mills on the Newton side of the river, and the mills that may be erected
on the two paper mill privileges on the Needham side, shall go and be used alter-
nately and by turns as follows, to wit: The paper mills on the Newton side shall go
and be used the first day, or twenty four hours, and the mills that may be erected
on the two paper mill privileges on the Needham side shall go and be used
the next day, or twenty four hours, and so on alternately, day and day about,
so long as there shall be a deficiency or want of water to work all the mills
on the said six paper mill and fulling mill privileges; and that all the paper mills
on the Newton side shall be considered as on the same footing, and as having the
same rights and privileges.

And the said parties do further covenant and agree to and with each other, as
aforesaid, that the respective parties, and their heirs and assigns, shall have
a right to substitute and erect any other mills, works or machinery, which they
may choose, in the place of any of the mills, works or machinery now erected
and used at said dam, or which the parties, their heirs and assigns, by virtue of
these articles of agreement, have a right to erect and use; provided the new
mills, works or machinery, shall require no greater power than the mills, works
or machinery which the parties have a right to erect and use by virtue of these
articles of agreement; and the rights and privileges of the new mills, works and
machinery that may be substituted, to be the same with the mills, works and
machinery which the parties, by virtue of these articles, have a right to erect
and use.

And the said parties do hereby further covenant and agree to and with each
other, as aforesaid, that the main dam at said mills shall forever be maintained,

at the time of that agreement, as follows: Simon Eliot and Solomon Curtis owned the two southern paper mills; Hurd & Bemis owned one paper mill and the saw mill; Moses Grant owned one paper mill, and John Ware one fulling mill, all on the Newton side. Simon Eliot and Solomon Curtis owned two thirds of the paper mill and two thirds of the saw mill, and Hurd & Bemis one third of the paper mill, and one third of the saw mill, on the Needham side.

At the time of the commencement of the plaintiff's action, the six paper mill privileges, mentioned in the agreement of 1816, were owned as follows, as appeared by the deeds put into the case : The two southern mills, on the Newton side, by the defendants, Allen C. and William Curtis ; and the two northern mills on the same side, by Lemuel Crehore ; the saw mill right on the Newton side, by the plaintiff, William Hurd ; and the land, on which stood the fulling mill of John Ware, by

kept up and preserved in the best repair, at the joint expense of the said parties, in proportion to their respective rights and privileges; and that each shall keep his floom perfectly tight ; and in case any one of said parties shall neglect to keep his floom in good repair, or shall neglect or refuse to contribute his share in repairing the main dam, either or all the other parties shall have a right to make such necessary repairs, either in the main dam, or the floom of such delinquent, and the parties so neglecting and refusing, shall pay all the cost and charges to him or them who shall have made such repairs.

And the said parties do further covenant and agree to and with each other, as aforesaid, that to prevent as far as possible the expense of litigation, in case any dispute should hereafter arise relating to their several rights as aforesaid, the parties, who shall have any controversy respecting the same, shall submit the same to arbitration, by a rule taken from some justice of the peace, in common form ; and if the parties cannot agree upon the referees as aforesaid, and a suit at law shall be commenced, they shall submit the same to reference, by a rule of court, if the parties can agree on referees, and if not, then the court shall have power to appoint three disinterested and impartial men, in the usual form, for referees.

In witness whereof, the parties have hereunto, and to three other parts of like tenor and date, set their hands and seals the day and year first above written.

|  |  |
|---|---|
| Simon Eliot. | (Seal.) |
| Solomon Curtis. | (Seal.) |
| Moses Grant. | (Seal.) |
| William Hurd. | (Seal.) |
| Charles Bemis. | (Seal.) |
| John Ware. | (Seal.) |

the defendants, who claimed, as connected therewith, the right of water and privileges as described in the agreement of July 1816, as appurtenant to the fulling mill, which they claimed under two deeds of the said John Ware to them, one bearing date September 15th 1824, and the other bearing date July 19th 1830.

The first of these deeds described the land thereby conveyed as follows : " A certain piece of land situated at the Lower Falls, in Newton aforesaid, containing one fourth of an acre, more or less, and bounded easterly on land of William Hurd, the easterly line of said piece of land hereby conveyed being three feet westerly of said Hurd's mill, and bounded southerly on land of said Allen C. Curtis and William Curtis ; westerly on Willard's orchard, formerly so called, being the same land lately improved by Solomon Curtis, deceased ; and northerly on land of William Hurd and the said Hurd's Grant mill, so called, reserving all rights of way and passage heretofore enjoyed and by me conveyed." The second of these deeds, after describing the land in the same terms as in the first deed, contained the following additional words : " Together with the flooms and watercourses, and rights of water to the same belonging, as by me heretofore used and enjoyed, and as fixed and determined by an indenture made and executed the 26th day of July 1816, between me and Simon Eliot, Solomon Curtis, Moses Grant, William Hurd and Charles Bemis, with all other rights, privileges and appurtenances to the same belonging, being the same piece of land on which formerly stood a building used and improved by me as a fulling mill, and carding wool by machinery ; reserving all rights of way and passage, heretofore enjoyed and by me conveyed."

The plaintiff, on the other hand, contended that the right to the fulling mill privilege was extinguished by force of sundry deeds made to himself or his grantors by said John Ware, prior to the date of the two foregoing deeds of said Ware to the defendants. One of these prior deeds, made by said Ware to the plaintiff and others, dated October 7th 1815, included the land three feet below the southwesterly corner of the paper mill of Hurd & Bemis, and running northerly on a line parallel with

the paper mill, between Moses Grant's paper mill and the saw mill to the road. Another of these prior deeds, made by said Ware to Moses Grant, (under whom the plaintiff claims,) dated August 8th 1816, conveyed " a small parcel of land in Newton, bounded as follows : Beginning at the southeast corner of Grant's paper mill, and running southerly four feet to my fulling mill ; thence westerly on my said fulling mill, and in a direction with the same, 30 feet ; thence northerly to the southwest corner of said Grant's paper mill ; thence easterly on said paper mill to the place of beginning." And with respect to the wheel of the fulling mill, Benjamin Neal, a witness called by the plaintiff, (and whose testimony was admitted to be true, for the purposes of this trial,) testified that when John Ware conveyed the said four feet of land to Moses Grant, the race, which was an artificial one, came under the Ware (or Hurd & Bemis) mill ; and that the wheel of the fulling mill was on the said four feet of land, and drew water from the end of the race, as it left the Ware (or Hurd & Bemis) mill : That after the conveyance from Ware to Grant, the wheel of the fulling mill was removed, and was placed on the strip of three feet of land contained in the deed of Ware to the plaintiff and others, dated October 7th 1815 ; and that the bearing of the wheel came very near to the paper mill of the Hurd & Bemis (or Ware) mill, and a little way, as the witness thought, within the line of the building ; and that the fulling mill was used, for some years after this, by Ware ; but the witness could not say how long it was before it was pulled down : That the water was taken out of the south side of the floom leading to the Grant mill, into a floom, and supplied the wheel of the fulling mill : That the floom covered the said three feet, and hard up to the Ware (or Hurd & Bemis) mill ; and the witness thought it made part of the side covering of the mill ; and that the fulling mill was pulled down after the defendants bought.

The defendants put in several deeds, one of which was from the plaintiff and Lemuel Crehore to Reuben Ware and William Clark, dated February 8th 1833, of a small piece of land in Needham, with a water privilege for a machine shop, described

and limited as follows: " The said Ware and Clark to draw their water from the north side of the race, through a gate connected with a tight dam, capable of being entirely closed, when the water does not run over the top of the main dam; thence into their floom and on their wheel, over a threshold on the same level as the other mill gates on the dam, or at the same level they may at any future time be raised or reduced to, through an *aperture four feet long* and *three inches wide*, being equal to one square foot of water and *no more, but with no right* or privilege to draw *water* for the use of said shop, except when the water runs over the main dam and planking of the pond through which Charles River runs, and from which the water is taken, at its present elevation or that to which it may be heie after raised or reduced ; which right and privilege is conveyed to said Ware and Clark, as a part or portion of the surplus water next following that part or portion denominated the first six paper mill rights, in the instrument dividing the water on the upper dam, at the Lower Falls, made by Eliot, Curtis, Grant, Hurd, Bemis and Ware, on the twenty sixth day of July 1816, and recorded with Middlesex deeds.    To have for use, at any and all times, so much water as shall pass through the said aperture four feet long and three inches wide, when the water runs over the said main dam and planking, but not otherwise, nor at any time exceeding one square foot of water."

At the time (April 20th 1824) when the abovementioned deed was made to John Dodd, the defendants, two of the grantors to Dodd, were owners of one of the two southern paper mills on the Newton side, under conveyances from Simon Eliot and Solomon Curtis; and Nichols and Ellis, the other grantors to Dodd, were owners of the other southern paper mill on the Newton side, under the same grantors, which by mesne conveyances had become the property of the defendants, at the date of the plaintiff's writ.

The plaintiff contended, that by the said deed to Dodd, and by the said deed to Amos Lyon, the indenture of July 26th 1816 was not only recognized, but that all its terms, stipulations and agreements were incorporated into, and made a substantial part

of the conveyance to Dodd, and those claiming under him; and that by force thereof, the defendants were equally bound and concluded, in regard to the two paper mill privileges owned by them on the Newton side of Charles River, and were restricted, as to their right of water, to the amount appropriated to those mills in said indenture.

The plaintiff further contended, that the privileges and rights referred to in the deed to Lyon, being granted to Dodd, and through him to the plaintiff, there was not only conveyed to him all the saw mill privilege, named in the indenture of 1816, on the Needham side, but also so much more water as might be drawn in consequence of the right granted to widen and deepen the channel, although the same should reduce the amount of water appropriated to the two southern paper mills, now belonging to the defendants, on the Newton side.

The plaintiff also contended, that by the deeds of John Ware to himself and those under whom he claims, the right or privilege of water, appropriated to the fulling mill by the indenture of July 1816, was extinguished.

On the other hand, the defendants contended, that there being no privity of estate between the parties to the indenture of July 1816, the covenants in it did not run with the land and bind the grantees of the several mills, as was determined in the case of *Hurd* v. *Curtis*, 19 Pick. 459: That by reason thereof, they were not bound by those covenants, as grantees, directly or through mesne conveyances of Simon Eliot and Solomon Curtis: That the reference to the indenture, in the deeds to Dodd and Lyon, was made for the more convenient mode of defining the amount of water privilege and power granted to the said Dodd; and that such reference to it had no effect to limit or restrict their own rights and privileges of water, under the deeds of their grantors: That they acquired and were the owners of the water privilege belonging to John Ware, at the time of making the indenture of 1816, as appropriated to the fulling mill privilege, and that the same was not extinguished by the deeds of Ware to the plaintiff or his grantors; That the rights mentioned as reserved in the deed to Lyon, and which were after-

wards granted to Dodd, were no grant of the saw mill privilege in Needham, but a mere right to enable him to use with more convenience the water appropriated and granted with the paper mill.

The defendants also offered to prove, that in the year 1825, (the plaintiff being dissatisfied with the quantity of water alleged by him to be drawn by the other mill owners on said dam,) certain open gates or apertures were, by agreement of all parties, made, one for each of said paper mills, and all on the same level, so as to divide the water power equally in its passage towards the several paper mills; and that such division was agreed to by the plaintiff and all the other mill owners on the dam, and that the same was continued to be used for ten years, without objection, when the plaintiff pulled down his gate without consent of the other owners: But that the same has been used ever since by the defendants, and that they have used for their paper mills no more water than what flowed through the gates so assigned to their two paper mill rights by said gates.

The plaintiff objected to the admission of the testimony respecting such agreement *in pais*, in relation to the erection and size of gates, because such evidence, as he contended, was incompetent to vary, change or regulate the rights of the plaintiff, as shown by the deeds of the estates and property in controversy; and also because any agreement made at the time alleged does not affect the plaintiff, so far as the mills and privileges set forth in the declaration are concerned; inasmuch as, at the time alleged, he was not the owner of the mills and mill privileges set forth in the declaration, but has acquired them long since. This evidence was rejected, reserving the question of its admissibility to the decision of the whole court.

Each party had many witnesses in attendance, to prove the mode of using the water at the respective mills of the parties, and the damages alleged to be sustained by the plaintiff. But the judge believing it to be very difficult, if not impracticable, to give such directions to the jury on the subject of the plaintiff's damages, if he had suffered any, as would be free from objection, before the construction to be given to the

deeds was settled, directed a nonsuit, with the consent of the parties, and reserved all questions of law which might be raised on the construction of the deeds, and all questions as to the admission of testimony to prove the agreement *in pais*, for a hearing before the whole court, prior to submitting the case to a jury.

*Mellen & G. T. Bigelow*, for the plaintiff.

*Dexter & Buttrick*, for the defendants.

SHAW, C. J.    Instead of stating at large the opinion of the court on the whole case, it is proposed now to express an opinion upon the leading questions which have been argued upon the construction of the deeds under which the plaintiff claims title to the water privilege.    The plaintiff claims damages of the defendants, on the ground that they have, for a long time, taken and used a larger quantity of water, at their mills, than they are entitled to take according to the relative rights of the parties.

1.    The first question arises upon the construction of the deed from Allen C. Curtis, William Curtis, John Nichols and Rufus Ellis, to John Dodd, dated April 20th 1824.    This is the deed under which the plaintiff claims, by several mesne conveyances.

The court are of opinion, that this deed conveyed to Dodd a fee in the tract of land therein described, bounded on Charles River; and also, to be used and enjoyed in connexion therewith, one paper mill right, as a first privilege, being a right of water for one paper mill with two engines, and with certain incidental rights to the surplus water, " being one of the six paper mill rights and privileges established," &c., by the agreement of 26th July 1816, recorded, &c.    By this reference to that record, the agreement of 1816 is to be resorted to, in construing this deed from Curtis and others to Dodd, in order to ascertain and define what a first paper mill right and privilege is, and the incidents belonging to it, in the same manner, in all respects, as if that agreement was set forth and embodied in the deed.    By that indenture of agreement it appears, that each of the parties to whom such paper mill privilege was

assigned had a right, in common with five others having equal paper mill privileges, and *one* a right for a fulling mill and carding machine, (being also a first privilege,) to use the water at all times, without preference, when there was enough for all ; and it contained provisions stipulating for a special mode in which each should use and abate, in proportion, when there should not be enough for all.

These seven, namely, six paper mill rights and one fulling mill right, are by the indenture made first rights, to be supplied equally, and to abate proportionably, without preference.    The second right, or first right to the surplus water, was assigned to the saw mill of Hurd & Bemis, on the Newton side.    The third right, or second right to the surplus water, was assigned to the six paper mill privileges, for the use of the glazing machines then attached, or which might be thereafter attached, to said paper mills.    No preference being given to either of these six privileges in this third right, they were to enjoy and share it equally.

Recurring then to the deed from Curtis and others to Dodd, we find, that with the said one paper mill privilege, there were conveyed all the rights, and *none other*, and subject, &c., as named in said agreement.    Under this provision, the said deed conveyed to said Dodd an equal right, with the five other paper mill proprietors, to an equal share of the surplus water for glazing mills, or other machinery requiring equal power, after supplying the seven first powers and the saw mill then owned by Bemis & Hurd on the Newton side.

But the more material question arises upon the other clause of this deed, granting all the grantors' rights and reservations, in their deed to Amos Lyon, of April 11th 1822.    (See this clause, *ante*, 97, 98.)

It appears by the report, that upon this clause the plaintiff contended, that he acquired not only the one full first privilege for a paper mill, with an incidental right to the surplus water belonging to such privilege, but also so much more water as might be drawn in consequence of the right granted to widen and deepen the channel, although the same should reduce the amount of water appropriated to the two southern paper mills,

belonging to the defendants, on the Newton side. But the court are of opinion, that this is not the true construction of the grant of those reservations and exceptions, and that the *water power* or privilege, granted in the former part of the deed to Dodd. is *not enlarged* by the special grant of the rights thus reserved.

It is manifest, from the whole tenor of the deed to Dodd, and of the previous deed of the same grantors to Amos Lyon, that they made a marked distinction between a grant of the land with which the water power was to be used, and the grant of the water power itself. This water power had been carefully defined, limited, and apportioned amongst all the proprietors, by the agreement of 1816, and this apportionment and distribution it was not the intention of the grantors, by either of these deeds. to alter or disturb.

Again ; in examining the localities, it is manifest that when they conveyed the land to Amos Lyon, with one full paper mill right, as defined, the land thus conveyed intervened between the bank of Charles River, above the dam, and other land of their own, adjoining the same bank of the river, lower down and below the dam ; that on this land, thus still held by them, was a convenient site for mills, upon which a saw mill had formerly stood ; and that there was an old channel, from a point on the bank of the river, above the dam, across the land con veyed to Amos Lyon, through which water had formerly been conveyed to the saw mill below. When, therefore, these grantors made their deed to Amos Lyon, owning, as they did, a valuable site for mills below the land conveyed, and owning other valuable water powers beyond that conveyed to Lyon which water powers could only be used and enjoyed by them upon the land mill site which they so owned, adjoining the river below, by a canal across the land conveyed, the true purpose and the legal effect of their reservations and exceptions in that deed were to have a right, by way of easement, to a canal, not exceeding sixteen feet wide, and of any required depth. It is an obvious rule, in the construction of grants containing an exception or reservation, that the thing excepted or reserved must be out of the thing granted, or parcel of that which would

10

have passed by the grant, if not thus excepted or reserved. An exception or reservation of something not embraced in the premises would be simply void; there being nothing for it to operate upon. The words *exception* and *reservation* are often used indiscriminately, though there is a known distinction between them. An exception is separating part of that embraced in the description, and already existing in specie; as excepting a particular parcel of land from a farm granted by general words. A reservation is something newly created, out of the granted premises, by force and effect of the reservation itself, as an easement out of land granted, or rent out of land demised. In this case the words are peculiar, if they are truly copied; they are, " the said Curtis, &c., except the reserve to themselves," &c. But such peculiarity of phraseology does not affect the sense, and, taking it according to the obvious meaning, it is equivalent to the words except *and* reserve; meaning, by use of both terms, to secure themselves the right in question, which in its nature is an easement. But here was no exception or reservation out of the water power granted to Lyon, the grant of which was clear and distinct; indeed, that is not claimed. It could not be out of their own other water power, because none such was granted to Lyon by the deed containing such reservations; and therefore, had it been so *in terms*, it would have been void, as a reservation, because there was nothing for it to operate upon. It would have left the grantors in the same condition, in that respect, as if no such reservation had been made. If such a clause were inserted, excepting or reserving all their other water power, it must be considered as done *ex majori cautelâ*, to prevent doubt; but it would still be void — neither adding to, nor diminishing, the grantors' such other water power. But here are no words purporting, by any construction, to except or reserve their own other water power. On the contrary, we think the reservation was clearly out of the *land granted*; to wit, a perpetual easement or servitude, over the land thus granted, to make and maintain a canal of the dimensions and depth specified, with the incidental right to make and maintain all necessary dams, sluices, and gates, for the purpose of

carrying such water works as they might erect on their own land. The right of the grantors to take water from the river, above the dam, for their mills to be erected below the land granted to Amos Lyon, was not created, enlarged or affected, by this reservation; that right, if it existed at all, existed previously and independently, and was derived from their respective grants, modified and regulated by the agreement of 1816.

With this view of what these grantors had, by force of this reservation in their deed to Amos Lyon, we are to inquire what they intended by a grant to Dodd of all the rights, privileges, benefits and interest in and to the exceptions and reservations to themselves, in their deed to Lyon. This conveyance to Dodd was a conveyance in fee of all the land which remained to them, lying below the land formerly conveyed by them to Amos Lyon, with one full first paper mill privilege, with the incidental privilege to surplus water, as defined, expressed and limited by the agreement of 1816.

It is immaterial, perhaps, to this inquiry, whether the agreement of 1816 is in force or not between these parties, as a mutual covenant or mutual grant. The grantors referred to it as a significant mode of expressing and defining the right of water which they intended to convey, and thus carefully described this paper mill privilege, as entitled to all the rights and *none other*, and subject to all the reservations, &c., of said agreement. The grantees accepted the grant, as thus described, qualified, and limited; and this principal and substantive grant of water power, to be used and enjoyed with the land conveyed, was limited, not by the dimensions of any aperture, gate, floom or canal, through which the water was to be drawn, but to a quantity sufficient to supply one paper mill with two engines, and the incidental right to surplus water, all as expressed in the agreement of 1816, in whatever mode or whatever place they might think fit to take it. Under this principal and substantive grant to Dodd, his heirs and assigns, they have a right to take and use the quantity of water thus ascertained, to and at any other mill, works, or machinery, at their pleasure, because such was the extent of a paper mill privilege, by the agreement.

The question then is, whether, by the subsequent clause in this deed, granting the rights under the exceptions and reservations in the deed to Amos Lyon, an additional water power was conveyed to Dodd and his assigns ; and the court are of opinion, that neither by any reasonable construction of the terms of this grant, as applied to the subject matter, nor any reasonable implication of the intent of the parties, can it be held that the water power was thus enlarged. By this subsequent clause, or third grant in their deed to Dodd and his assigns, the said Curtis and others did grant, assign, and convey to him, his heirs and assigns, all the rights, privilege, benefits, and interest in and to the exceptions and reservations which they excepted and reserved to themselves in their deed to Amos Lyon, which, for greater certainty, is recited in words at length. What, then, were the rights *reserved to themselves* by that exception ? Not any right of water power, for they held none *by that* reservation. If they had other water power, at the same dam, as they, or some of them, undoubtedly had, they might have granted it by apt words, to any extent to which they held it, even if it went to the destruction of their own other mills on the same dam. But no such additional right of water power was granted by this clause, because none such was reserved to themselves, by the exception and reservation in their deed to Lyon, and so does not come within the description.

But a most important and valuable right of the grantors did come within this description, and pass by this clause in their deed to Dodd and his assigns ; namely, a right to make and maintain a canal through and across the land of Lyon, and his assigns, forever, with suitable dams, gates, and sluices, in order to convey water to the extent of the water power granted in and by the same deed, and any other water power which he then had or might acquire, provided the same should not exceed the quantity which would flow through a canal not exceeding sixteen feet in width, and as deep as might be required ; and the further right to use and apply the water, so drawn through such canal, to any mills, works or machinery, which he might erect on the land conveyed by the same deed. This was the

full measure of the rights *reserved to themselves* by the excep tions and reservations in their deed to Amos Lyon, and, there fore, was the full measure of the rights granted by this clause in their deed to Dodd. Such appears to us to be the natural and legal construction of this last grant, and there is nothing in the deeds together, to induce a belief that the parties had a different intent. The construction contended for by the plaintiff would involve the improbable supposition, that these grantors, after making one distinct grant of water power, carefully defined and limited, intended, by a subsequent clause, to grant an additional water power, to be taken out of their own privileges, and defined by no more certain limit than that of so much water as would flow through a canal sixteen feet wide, and of any required depth. This would be the more improbable, because every where else in this deed to Dodd, in the deed to Amos Lyon referred to, and the agreement of 1816, also referred to, water powers are defined and described by the standard laid down in that agreement, and not by the dimensions of the canal through which the water runs. It is also improbable that they would make a grant, which would greatly impair, and perhaps nearly destroy, their other valuable privi leges, necessary to mills then in existence. It is true, that having such rights, they might grant them away; and if they had done so, they must bear the consequences, however onerous. But, in construing a grant, the court will not presume that they so intended, unless such intent is expressed in the terms of it, or may be reasonably implied from those terms and the subject matter.

It is not, however, upon the supposed extravagance of the plaintiff's claims, or the improbability that the grantor could have intended such a construction, if the words of his grant were such as would warrant it, that we rest this construction ; but upon the ground that the words of description in the deed to Dodd, from whom the plaintiff claims, do not, by the natural import of the terms, or any reasonable implication, include the enlarged water power which he now claims.

2. Another question was, whether by the various grants,

made part of the report, the fulling mill right was extinguished, or whether it had been acquired by the defendants.

The court are of opinion, that that right was not extinguished, but was acquired by the defendants, by the several deeds of John Ware to them of 1824 and 1830. It appears by the indenture of 1816, that John Ware was recognized as the owner of a fulling mill and carding machine, and a first privilege was assigned to him, upon equal grounds with the six paper mills, of water sufficient to carry such fulling mill and carding machine, or for other machinery requiring the same power. These rights, we think, were not inseparably annexed to any mills or buildings, or to any site at which they were then used, but might be used and enjoyed at any convenient site at which mills could be so placed as to take an equal quantity of water, and no more, from the same dam, and imposing no increased burden, by race-ways or otherwise, upon the other proprietors. The ground upon which it is claimed, on the part of the plaintiff, that this right was extinguished before his action was brought, was, that Ware had, in fact, conveyed away to the plaintiff, or those under whom he claims, the land across which the water was accustomed to flow to his fulling mill ; and that as this was an artificial canal, and not a natural watercourse, the grantees of such land might have filled up the canal, and stopped the water from flowing to his mill : Also, that in point of fact, the fulling mill and carding machine have been discontinued.

In point of fact, we think it does appear from the case, that Ware did convey away the land over which the canal passed, which led to his fulling mill, without reservation. But it further appears, that notwithstanding he had thus conveyed the land over which the canal passed leading to his fulling mill, and that the grantees might have filled it up, yet in fact they did not do so, and he continued to use the water through said canal, as before, till several years after the making of the agreement by which the water power was assigned and distributed in 1816. The probability is, that this canal was kept open by these grantees, for their own use, in serving other mills.

But if the grantees of that land had so filled up the canal, we are of opinion that his right to the use of the water, to carry his fulling mill and carding machine, or other machinery requiring equal power, did not depend upon taking the water through that canal, and that he might have obtained any other lands, by purchase or lease, over and through which the same quantity of water might have been drawn, for the same purpose; and that by filling up the canal, his water privilege would not have been extinguished.

We observe, for the purposes of argument, that his grantees of the land over which the canal was then open, by which his fulling mill was supplied, might have filled it up. But it is proper to suggest, that there might be a question, if it were material, whether, the grant being of land across which a canal then existed, being the only mode of supplying the grantors' mill, and such mill open, visible, and in actual operation, a right would not have been reserved to the grantor, by implication, to have such canal kept open; but of this we give no opinion.

But further; this fulling mill privilege was expressly recognized and provided for, by the agreement of 1816, as a first privilege; and the conveyance being made to Dodd, subject to all the provisions and reservations in that agreement, Dodd took his grant subject to that privilege. Such a privilege cannot be considered as extinguished or abandoned by disuse, until such disuse, entire and complete, has continued for the term of twenty years. It appears that Ware continued to use and occupy the mill, for several years after 1816; and he conveyed, by deed, the land and site of the fulling mill to the defendants, in 1824. This deed, however, not including in terms the water privilege, another was made from Ware to the defendants, in 1830, which conveyed the site of the fulling mill, and the water privilege, in full and ample terms. The right not being extinguished or abandoned at that date, supposing no conveyance of the privilege had before been made with the fulling mill site, we think this last deed was sufficient to pass the fulling mill privilege to the defendants, to be used for a fulling mill or for any other machinery, at their pleasure.